**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CRYSTAL DELP,                              )
                                          )
                Plaintiff,          )          Civil Action No. 10-285 Erie
                                          )
     v.                               )
                                          )
ROLLING FIELDS, INC.,                     )
                                          )
               Defendant.           )

## <u>MEMORANDUM OPINION</u>

McLAUGHLIN, SEAN J., District Judge.

Crystal Delp ("Plaintiff"), filed suit against Rolling Fields, Inc., ("Defendant"), alleging pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Pregnancy Discrimination Act of 1978, as amended, 42 U.S.C. 2000e *et seq.*, (collectively referred to as "Title VII"), and violations of the Family Medical Leave Act, 29 U.S.C. § 2611 *et seq.* ("FMLA"). Presently pending before the Court is the Defendant's Motion for Summary Judgment [ECF No. 26]. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I.      BACKGROUND

Defendant is a senior living and nursing home facility owned and operated by Kimberly Braham-Moody ("Braham-Moody"), Marlene Braham and Cindy Godfrey. Pl. Ex. C, Praetzel Dep. p. 10; Pl. Def. Ex. H, Braham-Moody Aff. ¶¶ 2, 43.[1] In 2002, Defendant restructured its facility to create six (6) "neighborhoods" or units known as "Streets." Def. Ex. I, Caregiver Guide pp. 72-73; Def. Ex. H, Braham-Moody Aff. ¶3; Pl. Ex. C, Praetzel Dep. p. 11; Pl. Ex. E, Taylor Dep. p. 10. Each Street consisted of two families, composed of elder residents and staff members, which included a "grandparent" member. Pl. Ex. C, Praetzel Dep. pp. 11-12, 14; Pl.

---

[1] Plaintiff's Exhibits are filed at [ECF No. 34]; Defendant's Exhibits are filed at [ECF No. 30] and [ECF No. 39].

Ex. E, Taylor Dep. p. 10.[2]  A "Care Team," whose individuals are referred to as "Caregivers," were comprised of Licensed Practical Nurses ("Licensed Caregivers"), Certified Nurses' Aides ("Certified Caregivers"), and Nurses' Aides ("Caregivers"), and are assigned to each Street.  Pl. Ex. C, Praetzel Dep. p. 12; Def. Ex. I, Caregiver Guide p. 72.

Care Teams are encouraged to work in a cooperative manner, and Caregivers assigned to a particular Street are encouraged to discuss issues regarding the work environment, co-workers, and scheduling with the grandparents of that Street.  Pl. Ex. A, Delp Dep. pp. 49-50; Pl. Ex. G, King Dep. pp. 39-40; Def. Ex. I, Caregiver Guide p. 72.  Each Care Team has one or two Caregivers that volunteer to serve as the Street's scheduling coordinator for the Care Team.  Pl. Ex. C, Praetzel Dep. pp. 17-18.

Defendant maintained a CARE Board, which is a peer disciplinary team that dealt with conflicts within a Care Team.  A, Delp Dep. pp. 53-54.  Defendant's Caregiver Guide states:

> When a conflict arises between caregivers, you should first consult with your CARE Board representative.  If circumstances prevent you from meeting with your representative, you can approach another CARE Board advisor, a member of the Policy Review Committee or your Eden Grandparent.
>
> Using the techniques described in the next paragraph on effective communication you should approach the caregiver with whom you have the problem and discuss your concerns.  You can do this privately, with the CARE Board representative or with several caregivers, depending upon the individual circumstances.
>
> Most issues will resolve themselves after the initial conversation; however, if the problem continues or matters become worse, your next step is to inform your CARE Board advisor.  Your advisor will place you on the agenda and notify both parties of the date, time, and location of the next meeting.  Both parties should provide a list of witnesses and copies of any supporting documentation to substantiate the case to the Advisor prior to the CARE Board Meeting.
>
> Each party and the witnesses provide testimony to the CARE Board who will make a decision based upon the testimony provided.  Once the determination is made, the Board is empowered to initiate corrective action as deemed appropriate,

---

[2] The grandparents were members of the Defendant's leadership team and were responsible for overseeing the Caregivers on their Street.  Pl. Ex. C, Praetzel Dep. pp. 14-15; Def. Ex. I, Caregiver Guide p.72.

from sentencing the wrongdoer to community service hours up to and including termination of employment.

Def. Ex. I, Caregiver Guide pp. 27-28.

Once an issue was brought before the CARE Board, it had the discretion to impose a wide variety of discipline, up to and including termination. Pl. Ex. C, Praetzel Dep. pp. 34-35. The CARE Board could also reduce an employee's work hours from full-time to part-time, or reassign them to another Street. *Id.* In addition to the CARE Board, grandparents, administrators and Defendant's owners also had the authority to discipline and/or terminate employees. Pl. Ex. C, Praetzel Dep. p. 25; Pl. Ex. E, Taylor Dep. pp. 14, 35.

Plaintiff was initially hired by Defendant on August 9, 2004 but subsequently resigned on September 3, 2004 for personal health reasons. Pl. Ex. A, Delp Dep. pp. 3436; Def. Ex. J; Def. Ex. L. During this first period of employment, there were no complaints about the Plaintiff and no discipline was imposed. Pl. Ex. C, Praetzel Dep. pp. 62-63. She was rehired by Defendant as a part-time Licensed Caregiver on November 5, 2007, and on February 29, 2008, she was transferred to a full-time position on Elm Street. Pl. Ex. A, Delp Dep. pp. 36, 40; Def. Ex. H; Def. Ex. M. As a full-time Caregiver, Plaintiff worked various shifts, including daytime and overnight shifts, and typically worked three 12-hour shifts per week. Pl. Ex. A, Delp Dep. p. 43.

At the time Plaintiff became full-time, Allyson DeVantier ("DeVantier") and Lynnette Mattson were the "grandparents" assigned to Elm Street who supervised, monitored and/or oversaw the Care Team. Pl. Ex. A, Delp Dep. p. 50; Pl. Ex. L, DeVantier Dep. p. 17. In June 2009, Sara King ("King") replaced Lynnette Mattson as a grandparent on Elm Street. Pl. Ex. A, Delp Dep. p. 40; Def. Ex. G, King Dep. p. 7. The Elm Street scheduling coordinator in January 2010 was Heather Burkhart ("Burkhart"). Pl. Ex. A, Delp Dep. p. 46; Pl. Ex. C, Praetzel Dep. pp. 14, 60; Pl. Ex. H, Burkhart Dep. p. 13. At all relevant times Praetzel was the Administrator of Rolling Fields and Taylor functioned as the Human Resources Director. Pl. Ex. C, Praetzel Dep. pp. 7-8; Pl. Ex. E, Taylor Dep. p. 8.

Beginning in the summer of 2009, DeVantier and King observed that Plaintiff had a negative attitude, was treating her co-workers badly on the Street, and that other Elm Street Care

Team members participated less frequently in meetings when Plaintiff was present. Pl. Ex. G, King Dep. pp. 49-53; Pl. Ex. L, DeVantier Dep. pp. 50-51, 92. In late August or early September of 2009, Licensed Caregiver Mary Lynn Kerr complained to Praetzel that Plaintiff had called off work as a result of which she was required to work a 16-hour shift. Pl. Ex. C, Praetzel Dep. p. 89. Praetzel noted that Kerr was upset because she felt Plaintiff did not help other Caregivers or offer to cover their hours when needed. *Id.* Praetzel directed Kerr to discuss the issue with Plaintiff and attempt to work as a team. *Id.* at p. 89. Praetzel informed Braham-Moody of the complaint. *Id.* at pp. 105-106. Plaintiff concedes that Kerr initiated this complaint, but denies that she engaged in any wrongdoing. Pl. Response to Statement of Facts p. 5 No. 54.

During a CARE Board meeting on October 20, 2009, Plaintiff's interactions with another Licensed Caregiver, Laura Deal ("Deal") were raised and discussed. Def. Ex. S, 10/20/09 CARE Board Meeting Minutes; Pl. Ex. C, Praetzel Dep. pp. 153-154; Pl. Ex. L, Devantier Dep. pp. 48-49. The Board minutes reflect the following:

> Elm Street --- … Laura [Deal] is also having problems with Crystal [Delp] and how she says things. Laura [Deal] and Elena [Reinhart] had a conversation with Crystal [Delp] and she was very upset.

Def. Ex. S, 10/20/09 CARE Board Meeting Minutes.[3] Plaintiff acknowledged that Deal was upset over an email Plaintiff had sent and that Deal characterized it as "rude." Pl. Ex. A, Delp Dep. pp. 54-59. Plaintiff further acknowledged that she and Deal had discussed the email in Elena Reinhart's presence. *Id.*

In November of 2009, Plaintiff learned she was pregnant and informed King, DeVantier, Praetzel and Braham-Moody. Pl. Ex. A, Delp Dep. p. 84; Pl. Ex. C, Praetzel Dep. p. 107; Pl. Ex. L, DeVantier Dep. p. 75. On or about November 17, 2009, she requested medical leave under the Family Medical Leave Act ("FMLA") due to complications with her pregnancy and it was promptly granted. Pl. Ex. A, Delp Dep. pp. 84-86; Pl. Ex. E, Taylor Dep. p. 38; Def. Ex. O, 11/20/09 Leave of Absence Request Form. Plaintiff was released to return to work full-time

---

[3]Elena Reinhart was a member of the CARE Board. Pl. Ex. L, DeVantier Dep. pp. 48-49.

without restrictions on or about November 30, 2009.  Pl. Ex. A, Delp Dep. p. 85; Def. Ex. P, 11/30/09 Return to Work Slip.  Plaintiff does not dispute that she was granted the leave and returned to work in the same position with the same job duties and rate of pay.  Pl. Ex. A, Delp Dep. 84-86; Pl. Ex. C, Praetzel Dep. p. 114.

In January of 2010, Plaintiff learned that she was pregnant again and informed Praetzel, King and DeVantier at that time.  Pl. Ex. A, Delp Dep. pp. 86-88;  Pl. Ex. C, Praetzel Dep. p. 110; Pl. Ex. G, King Dep. p. 44; Pl. Ex. L, DeVantier Dep. p. 79.  King and DeVantier were aware that Plaintiff was due to deliver in September of 2010 and would need time off at that point.  Pl. Ex. C, Praetzel Dep. p. 114; Pl. Ex. G, King Dep. p. 45; Pl. Ex. L, DeVantier Dep. pp. 79-81.

At about the same time, Burkhart, the scheduling coordinator for Elm Street, experienced difficulties working with Plaintiff.  Pl. Ex. H, Burkhart Dep. pp. 21-22.  Burkhart testified that Plaintiff had an "attitude," demanded a certain schedule, was rude towards her co-workers, and cursed at her several times.  *Id*. at pp. 21-24.  She also claimed that Plaintiff threw a set of keys at her.  *Id*. at pp. 27-28.  Burkhart voiced her complaints to Deb Hardy ("Hardy"), a CARE Board representative, in May of 2010.  *Id*. at pp. 45-46, 54-56.  Plaintiff acknowledged that she had "stressful interactions" with Burkhart over scheduling, but did not view those interactions as "negative."  Pl. Ex. A, Delp Dep. pp. 77-78, 171.

In early 2010, Deal again complained about Plaintiff's general lack of communication with her Care Team, as well as her treatment of Caregivers.  Pl. Ex. G, King Dep. pp. 68-69.  Deal reported that the newer Caregivers felt intimidated by Plaintiff, and that in her daily interactions with them she was "short."  *Id*.  Deal's concerns were relayed by King to DeVantier, who, in turn, discussed them with Elena Reinhart.  *Id*. at pp. 69-70.

During a CARE Board meeting on March 9, 2010, Plaintiff's difficulties interacting with other Caregivers on Elm Street were raised and discussed.  Def. Ex. T, 3/9/10 CARE Board Meeting Minutes; Pl. Ex. C, Praetzel Dep. pp. 119, 143-144; Pl. Ex. G, King Dep. pp. 60-61; Pl. Ex. L, DeVantier Dep. pp. 48-49.  As reflected in the Board minutes:

> Elm Street -- Brittany Reinhart and Danielle Crawford are having a difficult time with Crystal Delp being gruff. Dule [Miller] and Brittany [Reinhart] spoke to Crystal [Delp] and things seemed to improve. …

Def. Ex. T, 3/9/10 CARE Board Meeting Minutes. Plaintiff does not dispute that Dule Miller and Brittany Reinhart spoke to her, but characterized the interaction as "informal." Pl. Ex. A, Delp Dep. p. 63.

On May 7, 2010, DeVantier met with Caregiver Nicole Varee ("Varee"), concerning complaints Varee had regarding Plaintiff's treatment of her on Elm Street. Pl. Ex. L, DeVantier Dep. pp. 31-34. Varee informed DeVantier that she did not want to work with Plaintiff because Plaintiff was "gruff and rude" to her. *Id.* at pp. 32-33.

On May 9, 2010, Deal sent an email to Harding, an Elm Street CARE Board representative, wherein she reported that Varee and Brooke Hollobaugh ("Hollobaugh"), had complained to her that they were having difficulties with Plaintiff but were "scared" to approach her. Pl. Ex. C, Praetzel Dep. pp. 118-119; Pl. Ex. L, DeVantier Dep. pp. 42-43; Def. Ex. W, 5/9/10 Email. Harding showed Deal's email to DeVantier on May 10, 2009 and informed DeVantier that she would be following up. Pl. Ex. L, DeVantier Dep. pp. 42-44.

Sometime after May 10, 2010 the decision was made by Braham-Moody, King and DeVantier to reassign Plaintiff, as well as Deal, from Elm Street. Pl. Ex. G, King Dep. pp. 95-96; Pl. Ex. L, DeVantier Dep. pp. 64-65; Def. Ex. H, Braham-Moody Aff. ¶ 10. Plaintiff was reassigned as a result of the prior complaints and her inability to positively interact with her co-workers. Pl. Ex. G, King Dep. pp. 95-96; Pl. Ex. L, DeVantier Dep. pp. 36, 40, 45-46, 49-53, 55-56; Def. Ex. H, Braham-Moody Aff. ¶ 10.

On May 19, 2010, Plaintiff met with King and DeVantier and was informed that she was being reassigned from Elm Street. Pl. Ex. A, Delp Dep. p. 99; Pl Ex. G, King Dep. p. 98; Pl. Ex. L, DeVantier Dep. pp. 89-90. King and DeVantier allege that they informed Plaintiff that she was being reassigned because of several complaints of co-workers concerning her treatment of them. Pl. Ex. G, King Dep. pp. 98-101; Pl. Ex. L, DeVantier Dep. pp. 89-90. According to King and DeVantier, Plaintiff was also informed that she was expected to finish out her two-week work schedule on Elm Street. Pl. Ex. G, King Dep. p. 99; Pl. Ex. L, DeVantier Dep. p. 91. King

and DeVantier contacted three representatives from Ash, Birch and Cherry Streets to confirm that they would assist Plaintiff in covering her hours she would have worked on Elm Street. Pl. Ex. L, DeVantier Dep.p. 91. Plaintiff was informed that hours would be available for her to work on Ash, Birch and Cherry Streets, and that she should contact the scheduling coordinator on those Streets to secure hours. *Id*.

Plaintiff, on the other hand, claims that she was told she was being "pulled" from Elm Street because she was "too passionate" about her job and that she would need to find hours elsewhere in the home. Pl. Ex. A, Delp Dep. p. 99, 109. She also claims she inquired as to whether she could continue to work full-time but was informed it was not "guaranteed." *Id*. at pp. 138-139. She also denied having been told that she was to complete her two week schedule on Elm Street. *Id*.

On May 26, 2010, Plaintiff again met with King and DeVantier. Pl. Ex. A, Delp Dep. pp. 105-106. Plaintiff admits that she was told at this meeting that she was being reassigned because other Caregivers had complained she was intimidating. Pl. Ex. A, Delp Dep. pp. 116-117. Following this meeting, Plaintiff met with Taylor and Cara Gilchrist ("Gilchrist"), the scheduling coordinator for Cherry Street, regarding the scheduling of shifts for Plaintiff on other Streets. Pl. Ex. A, Delp Dep. pp. 119-120; Pl. Ex. E, Taylor Dep. p. 46. Plaintiff contends that at that meeting she was only offered two day shifts the following week, with one being on Cherry Street. Pl. Ex. A, Delp Dep. pp. 121-123. Plaintiff further testified that while she intended to work those two day shifts, she could not recall why she did not. *Id*. at pp. 123, 128-129.

Defendant, on the other hand, claims that Plaintiff was scheduled to work on Cherry Street for three shifts, namely, on May 31, 2010, June 1, 2010 and June 4, 2010. Pl. Ex. E, Taylor Dep. pp. 46, 49; Def. Ex. LL, Gilchrist Aff. ¶ 14. It is undisputed that Plaintiff failed to show up for any of these three shifts or call in advance to let Defendant know that she would not be working them. Defendant's written policy regarding attendance states the following:

> If you are unable to come to work, you must attempt to find someone from your Care Team who will work for you. If you are unable to find someone, you must then notify a member of your Care Team at least two hours before your shift begins. When it is possible to provide more than two hours advance notice,

please do so.  A "No Call, No Show" is when you do not report off to your Care Team in any manner.  This is not an acceptable work practice and a second occurrence will likely result in a meeting with the CARE Board.

Def. Ex. I, Caregiver Guide p. 21.

Defendant contends that Plaintiff was terminated on June 8, 2010 for violating its "No Call, No Show" policy.  Pl. Ex. I, Termination Letter; Def. Ex. H., Braham-Moody Aff. ¶ 36.[4]

## II.     STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A disputed fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).  Nonetheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  This requirement upholds the underlying purpose of the rule, which is to avoid a trial "in cases where it is unnecessary and would only cause delay and expense." *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (1976).  Therefore, if, after making all reasonable inferences in favor of the non-moving party, the court determines that there is no genuine issue of material fact, summary judgment is appropriate.  *Celotex*, 477 U.S. at 322; *Wisniewski, v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

---

[4] Employees who participated and/or were consulted with respect to Plaintiff's termination were Braham-Moody, Cynthia Godfrey, Praetzel, King, DeVantier, Alida Polk, and Taylor.  Pl. Ex. B, p. 3 No. 4.

# III. DISCUSSION

*Title VII*

Count I of Plaintiff's Complaint asserts a pregnancy discrimination claim in violation of Title VII, 42 U.S.C. § 2000e-2(a), as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). The PDA amended Title VII to clarify that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy." 42 U.S.C. § 2000e(k). "Rather than introducing new substantive provisions protecting the rights of pregnant women, the [PDA] brought discrimination on the basis of pregnancy within the existing statutory framework prohibiting sex-based discrimination." *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312 (11th Cir. 1994). The PDA does not require preferential treatment for pregnant employees. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 364 (3d Cir. 2008). "Instead, it mandates that employers treat pregnant employees the same as non-pregnant employees who are similarly situated with respect to their ability to work." *Id.*; *see also In Re: Carnegie Ctr. Assoc.*, 129 F.3d 290, 297 (3d Cir. 1997), *cert. denied*, 524 U.S. 938 (1998).

The familiar *McDonnell Douglas* burden-shifting framework is used in analyzing Title VII pregnancy discrimination claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Doe*, 527 F.3d at 364. Plaintiff has the initial burden of establishing a prima facie case of discrimination and if successful, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 319 (3d Cir. 2000). If the employer is able to do so, the plaintiff must then demonstrate that the proffered reason was merely a pretext for intentional discrimination. *Doe*, 527 F.3d at 364; *Goosby*, 228 F.3d at 319.

Here, Plaintiff claims Defendant discriminated against her on the basis of her pregnancy in violation of Title VII by involuntarily reassigning her from Elm Street on May 19, 2010 and by terminating her effective June 8, 2010. Defendant argues that Plaintiff has failed to establish a prima facie case of pregnancy discrimination with respect to either of these actions, and alternatively, has failed to come forward with any evidence to establish that Defendant's legitimate reasons for her reassignment and termination were pretextual.

9

### *Reassignment – prima facie case*

To establish a prima facie case of pregnancy discrimination, the employee must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she suffered an adverse employment action under circumstances giving rise to an inference of discrimination. *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 410 (3d Cir. 1999); *Weightman v Bank of New York Mellon Corp.*, 772 F. Supp. 2d 693, 701 (W.D.Pa. 2011).

The Supreme Court has defined an adverse employment action as a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). The Third Circuit has further explained that an employer's conduct will qualify as an adverse employment action "only if it alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affect[s] his [or her] status as an employee." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997) (citations and internal quotations omitted).

Defendant contends that Plaintiff cannot establish that her reassignment constituted an adverse action. *See e.g. DiCampli v. Korman Communities*, 257 Fed. Appx. 497, 501 (3d Cir. 2007) (finding involuntary transfer did not constitute an adverse employment action where change of position involved identical pay and benefits); *Riding v. Kauffman's Dept. Store*, 220 F.Supp.2d 442, 463 (W.D.Pa. 2002) (employee's reassignment with no change in pay, hours of work or other terms and conditions of employment did not constitute and adverse employment action). In this regard, Defendant contends that there were sufficient hours on three Streets available for her to continue to work on a full-time basis with no diminution in her rate of pay or hourly benefits. In essence, Defendant claims that Plaintiff simply "chose not to do so." Def. Brief p. 12.

In contrast, Plaintiff contends that she was only given two alternative shifts and was told that her full-time status "wasn't guaranteed." Pl. Ex. A, Delp Dep. p. 139. Viewing the evidence

10

in the light most favorable to the Plaintiff, we find that she has raised a triable issue of fact as to the allegedly adverse nature of her reassignment. *See e.g., Klimczak v. Shoe Show Companies*, 420 F. Supp. 2d 376, 382 (M.D.Pa. 2005) (reduction in scheduled hours can constitute an adverse employment action); *Lidwell v. University Park Nursing Care Center*, 116 F. Supp. 2d 571, 584 (M.D.Pa. 2000) (same); *Hose v. Buca Restaurants, Inc.*, 2008 WL 4000403 at *14 (W.D.Pa. 2008) ("Defendant fails to acknowledge that a reduction in hours can constitute an adverse employment action.").

Defendant argues, in the alternative, that she has failed to make out a prima facie case relative to her reassignment because she has failed to point to evidence that it occurred under "circumstances giving rise to an inference of pregnancy discrimination." For example, Defendant points to non-pregnant employees who were treated similarly or more harshly than her. In this regard, Deal was reassigned from Elm Street at the same time for negative interactions with her co-workers. Pl. Ex. C, Praetzel Dep. pp. 52-53, 125-126; Pl. Ex. E, Taylor Dep. pp. 68-69; Pl. Ex. G, King Dep. pp. 95-96; Pl. Ex. L, DeVantier Dep. pp. 130-132; Def. Ex. H, Braham-Moody Aff. ¶¶ 12-13. Like the Plaintiff, Deal was not reassigned to a particular Street and was responsible for contacting the scheduling coordinators for other Streets in order to secure hours. Pl. Ex. C, Praetzel Dep. pp. 52-53; Pl. Ex. E, Taylor Dep. p. 69; Pl. Ex. L, DeVantier Dep. p. 130.[5] Dessie Rosipko, a Certified Caregiver, was reassigned from Birch Street due to unauthorized changes to schedules, numerous call offs, and intimidation of Care Team members. Def. Ex. CC, 11/2/10-11/3/10 CARE Board Meeting Minutes. Like Deal, Rosipko was not reassigned to a particular Street but was to "pick up hours available in the home." *Id*.

Defendant has also produced unrebutted evidence that three other non-pregnant employees were terminated largely on the basis of their inability to positively interact with other

---

[5] Plaintiff argues that Deal was reassigned to a specific Street. Plaintiff's contention in this regard is based solely upon Miller's deposition testimony, who was not a decisionmaker with respect to Deal's reassignment, and who testified that she was "not positive" but "believe[d]" Deal was reassigned to Fig Street, but could not recall who told her. Pl. Ex. F, Miller Dep. pp. 13-14. This testimony is not only inadmissible hearsay, but is also speculative. *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 383 n. 12 (3d Cir. 1990) ("[A]n inference base upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment.").

Care Team members. The record reflects that Kim Jackson was terminated due to a poor attitude and performance issues. Def. Ex. DD, 4/4/08 Jackson Personnel records; Pl. Ex. C, Praetzel Dep. pp. 131-132; Def. Ex. H, Braham-Moody Aff. ¶ 25. Sharon Valesky was terminated due to a poor attitude. Pl. Ex. C, Praetzel Dep. pp. 130-131; Def. Ex. H, Braham-Moody Aff. ¶ 27. Finally, Sheri Ewing was terminated for lack of team cooperation, intimidation of other Care Team members and performance issues. Def. Ex. CC, 11/2/10-11/3/1- CARE Board Meeting Minutes; Def. Ex. H, Braham-Moody Aff. ¶ 28.

Plaintiff, in turn, points to the treatment afforded Jenn Jackson, another non-pregnant employee, to support her prima facie case. Plaintiff's Brief p. 44. The record reflects that Jackson was brought before the CARE Board based upon a complaint by another employee. Def. Ex. AA, CARE Board Minutes, 2/18/09. According to the CARE Board minutes, the decision was made to remove Jackson from Elm Street and reassign her to another Care Team immediately for an indefinite period. *Id*. She was subsequently reassigned to Cherry Street and given the same amount of hours. Pl. Ex. C, Praetzel Dep. p. 127; Pl. Ex. E, Taylor Dep. pp. 72-73. Plaintiff contends that since Jackson was not required to secure her own hours, an inference of discrimination has been raised.[6] We disagree.

The Third Circuit in *Simpson v. Kay Jewelers, Inc., Div. of Sterling, Inc.*, 142 F.3d 639 (3d Cir. 1998), noted that an inference of discrimination based upon evidence that a single comparator was allegedly treated more favorably "*may* be enough at the prima facie stage of the analysis" but such evidence should not be viewed in a vacuum. *Id*. at 646 (emphasis added). A plaintiff cannot selectively choose a comparator to establish discrimination, "because to hold otherwise would be to permit the inference of discrimination anytime a single member of a non-protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less

---

[6] Plaintiff also claims that Julie Wallace is an appropriate comparator, but there is scant evidence in the record relative to her reassignment. The record reflects that Wallace was removed from Dogwood Street and reassigned to Fig Street, and nothing more. Pl. Ex. F, Miller Dep. p. 15. We further find that Dule Miller was not similarly situated to Plaintiff given the voluntary nature of her reassignment. Pl. Ex. F, Miller Dep. pp. 9-12.

favorably." *Id.* at 646; *see also Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 359 (3d Cir. 1999) (holding that at the prima facie stage "evidence of differential treatment of 'a single member of the non-protected class is insufficient to give rise to an inference of discrimination.'") (quoting *Simpson*, 142 F3d at 646); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir. 1993) ("plaintiff cannot establish a prima facie case of racial discrimination by showing that, in a large department, a coworker of another race was treated more favorably than other coworkers of other races."), *cert. denied*, 511 U.S. 1071 (1994); *Haskins v. Christiana Care Health Servs.*, 701 F. Supp. 2d 623, 629 (D.Del. 2010) ("The determination of whether an employer's actions support an inference of discrimination is to be made based on the treatment of the allegedly more favored group as a whole, such that a showing of preferential treatment to one member of the non-protected class, standing alone, is generally not sufficient to create an inference of discrimination.").

In light of the above case law, Plaintiff's reliance on one isolated comparator, particularly given the number of non-pregnant employees who were treated similarly or *more harshly,* is insufficient to raise an inference of discrimination.

We further reject Plaintiff's contention that the timing of her reassignment raises an inference of discrimination. It is undisputed that Plaintiff informed King, DeVantier, Braham-Moody and Praetzel in January 2010 that she was pregnant and she was not reassigned until approximately five months later. *See Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007) (five month time period, without additional evidence, insufficient to raise an inference of causation); *Bartos v. MHM Correctional Services, Inc.*, 454 Fed. Appx. 74, 78 (3d Cir. 2011) (holding five months was not unduly suggestive of a causal connection); *LeBoon v. Lancaster Jewish Community Center Assoc.*, 503 F.3d 217, 233 (3d Cir. 2007) (gap of three months, without more, cannot create an inference of causation); *Williams v. Philadelphia Housing Auth. Police Dept.*, 380 F.3d 751, 760 (3d Cir. 2004) (two months not unusually suggestive), *cert. denied*, 544 U.S. 961 (2005); *Riley v. Shinseki*, 2009 WL 2957793 at *6 (W.D.Pa. 2009) (holding four month and six month time periods were so "patently remote" that no inference could be properly drawn), *aff'd*, __ Fed. Appx., __, 2011 WL 18760 (3d Cir. 2011).

Summary judgment will be granted as to Plaintiff's Title VII claim based on her reassignment.[7]

### *Reassignment – pretext*

Alternatively, even if a prima facie case had been made out relative to Plaintiff's Title VII reassignment claim, summary judgment would be appropriate based upon a failure to raise a triable issue of fact as to pretext. To satisfy her burden at this stage, Plaintiff must point to "some evidence, direct or circumstantial, from which a factfinder could reasonsably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perski*, 32 F.3d 759, 764 (3d Cir. 1994); *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000). In doing so, a plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (quoting *Ezold V. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)); *Riding*, 220 F. Supp. 2d at 448.

A plaintiff may not, however, "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 93d Cir. 1997) (quoting *Fuentes*, 32 F.2d at 765); *Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 413 (3d Cir. 1990). In other words, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109.

Plaintiff contends that Defendant's disciplinary policy required a verbal conversation followed by a written warning prior to the imposition of any further disciplinary action. However, the record does not support Plaintiff's contention that there was a rigid disciplinary policy that was disregarded in her case. Plaintiff acknowledged that she was aware that Kerr,

---

[7] Nor does a review of the record reveal any other evidence that would reasonably support an inference of pregnancy discrimination for purposes of her prima facie case.

Deal, Reinhart and Crawford all expressed complaints regarding her interactions with them in some form or fashion. Pl. Response to Statement of Facts p. 5 No. 54; Pl. Ex. A, Delp Dep. pp. 54-59, 61-63. In addition, Plaintiff conceded that the issues relating to her interactions with Deal, Reinhart and Crawford were discussed with her in the presence of a CARE Board Representative. Pl. Ex.A, Delp Dep. pp. 54-59, 61-63. Whether Plaintiff considered these sessions as counseling or discipline is immaterial.[8]

### *Termination – prima facie case*

We reach the same conclusion with respect to Plaintiff's prima facie case based upon her termination as we did with respect to her reassignment. There is no evidence on this record to support the reasonable conclusion that Plaintiff's termination occurred under circumstances giving rise to an inference of discrimination. Plaintiff does not point to any evidence that similarly situated non-pregnant Caregivers were treated more favorably. On the other hand, Defendant has supplied uncontradicted evidence which establishes that between 2007 and 2010, thirty-one (31) non-pregnant Caregivers were terminated by Defendant for violations of its "No Call, No Show" policy. Def. Ex. H, Braham-Moody Aff. ¶¶ 38, 42. Accordingly, Plaintiff cannot establish an inference of discrimination based upon comparator evidence.

In addition, Plaintiff's suggestion that discrimination may be inferred based on her contention that she never formally accepted whatever hours were offered does not advance her prima facie case. There is no evidence to suggest that the decisionmakers did not genuinely believe that she had accepted and was scheduled to work three shifts but failed to call in or obtain a replacement. "[I]t is not enough for a plaintiff to show that an employer's decision was wrong or mistaken, because the issue is whether the employer acted with discriminatory animus." *Abramson v. William Paterson College*, 260 F.3d 265, 283 (3d Cir. 2001).[9]

---

[8] Plaintiff relies on the same disparate treatment evidence we found inadequate to support her prima facie case in support of her claim of pretext.

[9] Plaintiff's assertion that the timing of her termination establishes the requisite inference of pregnancy discrimination fails for the same reasons as discussed in connection with her Title VII reassignment claim. *See supra* p. 13.

Summary judgment will be granted in favor of Defendant on Plaintiff's Title VII claim relative to her termination.[10]

### FMLA

Count II of the Plaintiff's Complaint asserts violations of the FMLA, 29 U.S.C. § 2611 *et seq*. The FMLA was enacted "to 'balance the demands of the workplace with the needs of families,' and 'to entitle employees to take reasonable leave for medical reasons … in a manner that accommodates the legitimate interests of employers.'" *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F3d 125, 140-41 (3d Cir. 2004) (quoting 29 U.S.C. § 2601(b)(1), (b)(3)). An "eligible employee" under the FMLA is entitled to "a total of twelve workweeks of leave during any twelve month period" because of "the birth of a son or daughter of the employee and in order to care for such son or daughter" or because of "a serious health condition that makes the employee unable to perform the functions of the employee's position." 29 U.S.C. § 2612(a)(1). After a period of qualified leave, an employee is entitled to reinstatement to their former position or an equivalent one with the same benefits and/or terms. 28 U.S.C. § 2614(a).

Two distinct causes of action are recognized under the FMLA. 29 U.S.C. §§ 2612, 2614(a)(i), 2615(a)(1) and (2); *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d Cir.), *cert. denied*, 546 U.S. 876 (2005); *Conoshenti*, 364 F.3d at 146; *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 805 F. Supp. 2d 190, 200 (W.D.Pa. 2011). These are an "interference" claim, where a plaintiff alleges that an employer interfered with a FMLA right, and a "retaliation" claim, where the plaintiff alleges the employer took an adverse employment action against the employee in retaliation for taking FMLA leave. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508-09 (3d Cir. 2009); *Bearley v. Friendly*, 322 F. Supp. 2d 563, 570-71 (M.D.Pa. 2004).

An interference claim arises under § 2615(a)(1) of the FMLA, which makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" under the Act. 29 U.S.C. § 2615(a)(1). An employer interferes with an employee's rights by refusing to authorize FMLA leave or by discouraging an employee from

---

[10] Summary judgment would be independently appropriate based upon Plaintiff's failure to have raised a triable issue of fact as to pretext. She relies on the same evidence in support of her claim of pretext that she offers in support of her prima facie case.

using such leave. 29 C.F.R. § 825.220(b); *Lichtenstein*, 805 F. Supp. 2d at 200. "[To] assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 402 (3d Cir. 2007); *Callison*, 430 F.3d at 119. The plaintiff need not establish that she was treated differently than others, and an employer cannot justify its actions by setting forth a "legitimate business purpose" for its decision. *Callison*, 430 F.3d at 119-20. "An interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Id.* at 120.

A retaliation claim arises under a different provision of the FMLA, which makes it illegal for an employer to "discharge or in any manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). Like a Title VII discrimination claim, FMLA retaliation claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas*. *Callison*, 430 F.3d at 119; *Parker v. Verizon Pa., Inc.*, 309 Fed. Appx. 551, 555 (3d Cir. 2009) (applying *McDonnell Douglas* paradigm in the context of an FMLA retaliatory discharge claim).

### Interference

In order to state a claim for interference under the FMLA, a plaintiff must demonstrate that: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which she was entitled under the FMLA. *Johnson v. Community College of Allegheny County*, 566 F. Supp. 2d 405, 446 (W.D.Pa. 2008); *Treaster v. Conestoga Wood Specialties, Corp.*, 2010 WL 2606479 at *25 (M.D.Pa. 2010).

Plaintiff appears to assert that Defendant interfered with her rights under the FMLA with respect to her FMLA leave in November 2009. Plaintiff's Brief p. 31. This contention is meritless. It is undisputed that on or about November 17, 2009, Plaintiff requested medical leave under the FMLA due to complications related to her pregnancy and it was promptly granted. Pl. Ex. A, Delp Dep. pp. 84-86; Pl. Ex. E, Taylor Dep. p. 38; Def. Ex. O, 11/20/09 Leave of

Absence Request Form.  Plaintiff was released to return to work full-time without restrictions on or about November 30, 2009.  Pl. Ex. A, Delp Dep. p. 85; Def. Ex. P, 11/30/09 Return to Work Slip.  Plaintiff has admitted that she experienced no problems or issues in requesting immediate FMLA leave, and that following her leave, she returned to work in the same position with the same job duties and same rate of pay.  Pl. Ex. A, Delp Dep. 84-86; Pl. Ex. C, Praetzel Dep. p. 114.  Consequently, any interference claim related to Plaintiff's FMLA leave in November of 2009 fails as a matter of law.

Plaintiff also contends that Defendant interfered with her FMLA rights by failing to advise her of her rights when she requested leave from Taylor in May 2010.  Plaintiff's Brief p. 33.  Interference with an employee's rights includes an employer's failure to advise the employee of her rights under the FMLA.  *Conoshenti*, 364 F.3d at 142-43.  An employer's failure in this regard however, can only constitute interference if the Plaintiff proves that she was prejudiced by that failure in that, had she been properly informed of her FMLA rights, she would have structured her leave differently.  *Id.* at 144-46; *Lupyan v. Corinthian Colleges, Inc.*, 2011 WL 4017960 at *5 (W.D.Pa. 2011) ("A plaintiff asserting a failure to advise claim must also prove prejudice by showing that had she been properly informed of her FMLA rights, she could have structured her leave differently.").  There is, however, no evidence of prejudice and this claim fails on that basis.

Plaintiff also alleges that following her request for FMLA leave on May 17, 2010, Defendant denied her benefits to which she was entitled by terminating her.[11]  Defendant first argues that Plaintiff cannot satisfy the "notice" requirement of her interference claim because she never actually applied for this leave.  Pl. Ex. A, Delp Dep. pp. 92-94.  Plaintiff arguably satisfied the notice requirement under the standard enunciated in *Sarnowski v. Air Brooke Limousine*, Inc., 510 F.3d 398 (3d Cir. 2007):

---

[11] Plaintiff has also asserted an interference claim based on her reassignment.  In our view, however, Plaintiff's reassignment claim is properly viewed as a retaliation claim rather than an interference claim.  *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) (an interference claim may arise when an employee is terminated as a result of exercising her FMLA rights).  Our conclusion in this regard is consistent with the Third Circuit Model Jury Instruction, which recognizes that in defending against an interference claim, the only recognized affirmative defense for an employer relates to the termination of an employee.  *See Third Circuit Model Jury Instruction* 10.1.1.

> In providing notice, the employee need not use any magic words. The critical question is how the information conveyed to the employer is reasonably interpreted. An employee who does not cite to the FMLA or provide exact dates or duration of the leave requested nonetheless may have provided his employer with reasonably adequate information under the circumstances to understand that the employee seeks leave under the FMLA. …

*Sarnowski*, 510 F.3d 402-03.

Like the plaintiff in *Sarnowski*, Plaintiff claims she informed Taylor in May 2010 that she was pregnant and was due to deliver in September. It is also undisputed that Praetzel, King and DeVantier were informed by the Plaintiff in January 2010 that she was pregnant, and all three assumed that Plaintiff would need time off at some point. This testimony demonstrates that Plaintiff made Defendant aware that she would need an FMLA-qualifying leave, as well as the anticipated timing of the leave. *See Mascioli v. Arby's Restaurant Group, Inc.*, 610 F. Supp. 2d 419, 435 (W.D.Pa. 2009) (holding plaintiff adduced sufficient evidence to meet the notice requirement where she communicated her medical condition to defendant and conveyed future time off may be necessary because of her medical condition). We conclude, however, for the reasons discussed more fully below, that Plaintiff has failed to raise a triable issue of fact as to the reason she was terminated.

Terminating an employee for a valid FMLA request may constitute interference with the employee's FMLA rights, as well as retaliation against the employee. *Erdman,* 582 F.3d at 509; *Michniewicz v. Metasource,* LLC, 756 F. Supp. 2d 657, 656 (E.D.Pa. 2010). An employee may proceed under either or both theories. *Hayduk v. City of Johnstown*, 386 Fed. Appx. 55, 59 (3d Cir. 2010), cert. denied, __ U.S. __, 131 S.Ct. 1002, 178 L.Ed.2d 834 (2011). As previously stated, "liability in an interference claim is not dependent upon discriminatory intent, but rather is based upon the act of the interference itself." *Mascioli*, 610 F. Supp. 2d at 430 (citing *Callison*, 430 F.3d at 120). Although an employee can prove interference regardless of the employer's intent, an FMLA interference claim is not a strict liability statute. *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) (rejecting the argument that employers are strictly liable for all FMLA violations); *Leese v. Adelphoi Village, Inc.*, 2012 WL 2049460 at *6 (M.D.Pa. 2012) ("an FMLA interference claim is not analogous to a strict liability

claim"). "[T]he FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA." *Sarnowski*, 510 F.3d at 403; *see also Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960-61 (10th Cir. 2002) (holding that employee may be dismissed so long as "the dismissal would have occurred regardless of the employee's request for or taking of FMLA"). Therefore, "interference with an employee's FMLA rights does not constitute a violation if the employer has a "legitimate reason unrelated to the exercise of FMLA rights for engaging in the challenged conduct." *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

In *Parker v. Verizon Pennsylvania, Inc.*, 309 Fed. Appx. 551 (3d Cir. 2009), plaintiff took FMLA leave for an autoimmune disease which affected his ability to breath and talk. *Id*. at 552-53. During his leave, he was observed performing construction work at the site of his new home, and was subsequently terminated for misrepresenting his health condition. *Id*. at 554. Plaintiff claimed that defendant had interfered with his FMLA rights by terminating him while he was on leave. *Id*. at 554-55. The court affirmed the grant of summary judgment stating:

> Parker has not shown that he is entitled to FMLA benefits because he has not met his burden of showing that there is a genuine issue of material fact over the reason he was not reinstated. He alleges that Verizon interfered with his FMLA rights by terminating him instead of restoring him to his position after he took FMLA leave on September 14, 2006. Verizon has demonstrated that Parker was not terminated for his use, but rather his misuse, of medical leave in violation of its Code of Business Conduct, which could have been the case for any employee who dishonestly used Verizon's benefits. *Edwards v. Harleysville Nat. Bank*, 2008 WL 4589729 at *5 (E.D.Pa. Oct.14, 2008). *Regardless of Parker's denial that he actually misrepresented his health condition, Verizon's honest suspicion that Parker misused his leave prevents it from being found liable for violating the FMLA; Parker was not entitled to the right of reinstatement if Verizon honestly believed that he was not using FMLA leave for the intended purpose.* Parker should not automatically be granted a greater degree of protection from termination simply because he happened to be using FMLA leave instead of sick leave. *Id*. The evidence shows that Parker's employment would have been terminated because of his violation of company policy regardless of the involvement of FMLA leave. …

*Parker*, 309 Fed. App. at 563 (emphasis added).

Similar to *Parker*, and for the reasons previously discussed, Plaintiff has failed to raise a triable issue of fact relative to Defendant's contention that she was terminated for a "legitimate reason unrelated to the exercise of FMLA rights," specifically, the violation of the No Call, No Show policy. While Plaintiff contends that she did not formally accept the shifts of May 31, 2010, June 1, 2010 and June 4, 2010, she has offered no evidence to rebut Defendant's contention that it reasonably believed she had done so. Pl. Ex. E, Taylor Dep. pp. 46, 49-51; Def. Ex. LL, Gilchrist Aff. ¶ 14. Moreover, while Plaintiff could only recall two shifts having been offered to her, she conceded that she intended to work those shifts but could not recall why she did not. Pl. Ex. A, Delp Dep. pp. 122-123, 127. Summary judgment will therefore be granted as to Plaintiff's interference claim based upon her termination.

### Retaliation

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she was a covered employee who invoked her rights to FMLA benefits; (2) she suffered an adverse employment action; and (3) the adverse action was causally related to the exercise of her FMLA rights. *Erdman*, 582 F.3d at 508; *Conoshenti*, 364 F.3d at 146. Proof of causation can be established in a number of ways. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir.), cert. denied, 522 U.S. 914 (1997). Temporal proximity between an employee's protected activity and an adverse action can be sufficient to establish causality for purposes of a prima facie case of retaliation if it is "unusually suggestive." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000); *Lichtenstein*, 805 F. Supp. 2d at 210; *see also Andreoli,* 482 F.3d at 650 (five month time period, without additional evidence, insufficient to raise an inference of causation); *Bartos,* 454 Fed. Appx.at 78 (holding five months was not unduly suggestive of a causal connection); *LeBoon,* 503 F.3d at 233 (gap of three months, without more, cannot create an inference of causation); *Williams,* 380 F.3d at 760 (two months not unusually suggestive); *Riley,* 2009 WL 2957793 at *6 (holding four month and six month time periods were so "patently remote" that no inference of causation could be properly drawn); *Keeshan v. Home Depot U.S.A., Inc.*, 2001 WL 310601 at *12 (E.D.Pa. 2001) (termination occurring four months after return from FMLA leave not unusually suggestive), *aff'd*, 35 Fed. Appx. 51 (3d Cir. 2001);

*Coppa v. Am. Soc'y for Testing Materials*, 2005 WL 1124180 at *3 (E.D.Pa. 2005) (holding that termination three months following FMLA leave was "too long a period to establish a causal link").

Plaintiff's reassignment and termination which occurred over six months after her November 2009 FMLA leave related to her first pregnancy is not temporally suggestive of the requisite causation. With respect to her request for FMLA leave on May 17, 2010, Plaintiff argues that her reassignment on May 19, 2010 and termination on June 8, 2010 were so close in time that the causation prong of the prima facie case is satisfied. A similar argument was advanced by the plaintiff in *McCormick v. Allegheny Valley School*, 2008 WL 355617 at *19 (E.D.Pa. 2008), who argued that the short time period between her request for leave and receipt of written discipline were so unusually suggestive as to satisfy the causation prong. In rejecting this argument, the court stated:

> …In this case, though, the actual time frame is much broader. In April 2004, Ms. McCormick informed AVS management of her pregnancy and her intention to take FMLA leave. While she did not officially request leave until 13 days before receiving written discipline, AVS was aware of both her pregnancy and her intention to take FMLA leave for *seven months* before she received the written warning. The organization's long-term knowledge of her situation renders lame Ms. McCormick's argument that temporal proximity alone is enough to establish the necessary causal link. …

*McCormick*, 2008 WL 355617 at *19 (emphasis in original).

Here, similar to *McCormick*, it is undisputed that King, DeVantier, Braham-Moody and Praetzel were all aware since January 2010 that Plaintiff was pregnant, and King and DeVantier were aware of Plaintiff's anticipated due date in September 2010. Pl. Ex. A, Delp Dep. pp. 86-88; Pl. Ex. C, Praetzel Dep. p. 110, 114; Pl. Ex. G, King Dep. pp. 44-45; Pl. Ex. L, DeVantier Dep. pp. 78-79. Plaintiff's reassignment and subsequent termination however, occurred five and six months, respectively, after Plaintiff informed management of her second pregnancy. Accordingly, the timing of Plaintiff's reassignment and termination is not unusually suggestive of retaliatory animus.

Plaintiff further points to evidence she contends establishes "ongoing antagonism." Plaintiff's Brief pp. 40-41. Absent temporal proximity, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997); *Farrell*, 206 F.3d 280. A causal connection may be established, for example, when a plaintiff experiences a "constant barrage of written and verbal warnings … and disciplinary action, all of which occur[ ] soon after plaintiff's [protected activity] and continue[ ] until his discharge." *Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1993).

Plaintiff's evidence of an alleged "pattern of antagonism" however, consists only of her reassignment from Elm Street. Plaintiff's Brief pp. 40-41. "One act does not constitute a "pattern" of antagonism." *Washco v. Federal Express Corp.*, 402 F. Supp. 2d 547, 560 (E.D.Pa. 2005); *Disilverio v. Service Master Professional*, 2007 WL 1029759 at *11 (W.D.Pa. 2007) ("one incident does not make a pattern of retaliatory antagonism"). Moreover, the occurrence of disciplinary action following protected activity does not establish a pattern of antagonism. *Weston v. Pennsylvania*, 251 F.3d 420, 432-33 (3d Cir. 2001), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53 (2006) (two suspensions imposed for attendance violations did not establish a pattern of intervening antagonism when other employees were similarly disciplined).

Given the lack of temporal proximity, as well as any evidence of a "pattern of antagonism," we find that Plaintiff's prima facie case of retaliation based on the FMLA fails. Consequently, summary judgment is granted as to this claim.[12]

## IV. CONCLUSION

An appropriate Order follows.

---

[12] Alternatively, even if a prima facie case had been made out, summary judgment would be independently supportable on the basis of Plaintiff's failure to have raised a triable issue of fact relative to pretext for the same reasons discussed in connection with Plaintiff's Title VII claim.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

CRYSTAL DELP,             )
                              )
               Plaintiff,       )      Civil Action No. 10-285 Erie
                              )
      v.                       )
                              )
ROLLING FIELDS, INC.,    )
                              )
              Defendant.    )

## ORDER

AND NOW, this 1st day of August, 2012, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment [ECF No. 26] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Rolling Fields, Inc., and against Plaintiff, Crystal Delp.

The clerk is directed to mark the case closed.


                                 s/ Sean J. McLaughlin
                                  United States District Judge


cm:    All parties of record